Filed 5/11/15  P. v. Gonzalez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| THE PEOPLE, | B252881 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA118600) |
| v. | |
| GABRIEL GONZALEZ et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  John A. Torribio, Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant Gabriel Gonzalez.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant Thomas Resendez.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant Colt H. Sanchez.

David C. Paquin, for Defendant and Appellant Roxanne Calleros.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Paul M. Roadarmel, Jr. and Stephanie Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellants Gabriel Gonzalez, Thomas Resendez, Colt Sanchez, and Roxanne Calleros appeal from their judgments of conviction of second degree murder (Pen. Code,[1] § 187, subd. (a)) with true findings on gang enhancement allegations (§ 186.22, subd. (b)(1)). Appellants join in raising the following arguments on appeal: (1) the evidence was insufficient to support the second degree murder convictions and gang enhancement findings; (2) the trial court erred in ruling on the admissibility of certain evidence; (3) the trial court erred in instructing the jury on the natural and probable consequences theory of aiding and abetting liability; (4) the trial court erred in failing to instruct the jury on the lesser included offenses of voluntary manslaughter based on imperfect self-defense and involuntary manslaughter; and (5) there was cumulative error. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Charges

In an information filed by the Los Angeles County District Attorney, appellants were charged with the murder of Jose Ramos (§ 187, subd. (a)). As to each appellant, it was alleged that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)). It also was alleged that Sanchez personally used a deadly and dangerous weapon during the commission of the crime (§ 12022, subd. (b)(1)). In addition, it was alleged that Sanchez, Resendez, and Gonzalez had served prior prison terms within the meaning of section 667.5, subdivision (b), and had prior serious or violent felony convictions within the meaning of section 667, subdivision (a)(1), section 1170, subdivision (h)(3), and/or the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). Each appellant pleaded not guilty to the murder charge and denied the enhancement allegations. The case was tried to a jury in April 2013.

---

[1]     Unless otherwise stated, all further statutory references are to the Penal Code.

## II.    The Prosecution Evidence

### A.    The Stabbing Death of Jose Ramos

On January 23, 2011, Jose Ramos was stabbed to death while attending a birthday party for his girlfriend, Stephanie Chagolla, at her house in Pico Rivera. Ramos was 18 years old at the time and Chagolla was turning 19. The party was by invitation only for Chagolla's family and friends, many of whom had attended high school with her and Ramos. The party was held in the backyard of Chagolla's house, and guests entered through a metal gate that opened inward to the backyard. Approximately 20 to 40 guests attended the party; although a number of them were drinking alcohol, no one appeared to be drunk. At one point, the police asked that the volume of the music be lowered without ordering any of the guests to leave.

Shortly after midnight, Calleros, who had attended high school with Chagolla but had not been invited to the party, tried to gain entry through the gate. She was accompanied by a group of about seven to nine people, including Sanchez, Gonzalez, and Resendez, who were members of the Pico Nuevo gang. Chagolla did not know any of the men who were with Calleros and had not invited any Pico Nuevo gang members to her party. Calleros and her companions initially were met at the gate by Jesus Munoz and Richard Iso, two of Chagolla's guests. As Munoz was attempting to close the gate after letting in two of his friends, Calleros stopped him from doing so and repeatedly asked him to allow her group into the party. Munoz told her that it was not his party and he had to get permission because she had a lot of people with her. Munoz then made eye contact with Ramos, who walked over to the gate.

As Munoz turned to talk to Ramos, Calleros and her companions began walking through the partially open gate. Ramos and Munoz initially were going to let them stay, but as more people followed, they became concerned there were too many people "just pouring in." Ramos stepped in front of the group at the gate and held up his hand in a "stopping gesture." He calmly told them that it was not his party and only family and friends had been invited. He also said he "didn't want to start anything." Calleros began arguing with Ramos and insisted that her group be allowed into the party. At some point,

3

Chagolla, who was watching the events at the gate, heard Calleros say, "This is my hood." Although Calleros said "don't push me" or "don't touch me," no one saw Ramos touch Calleros. The group with Calleros then rushed or pushed into the backyard and began fighting with Ramos and some of the other guests.

During the fight, Ramos was stabbed and fell to the ground. The fighting ended when an unidentified Hispanic man who was with the uninvited group of people pulled out a semi-automatic gun and waved it at the guests. He then fired several shots into the air, causing the guests to drop to the ground or run for cover. The uninvited group fled the backyard and entered one or two vehicles, including a dark sports utility vehicle, which sped away. After calling "911," Chagolla and her guests tried to render aid to Ramos, who was lying on the ground near the gate and struggling to breathe.

Ramos sustained a total of three stab wounds, one of which was fatal. He was stabbed in the shoulder, abdomen, and chest, and died from the stab wound to the chest, which pierced his heart. The fatal wound was four and three-quarter inches deep and went from front to back in a slightly downward angle. There were several abrasions to Ramos's face, but no defensive injuries to his hands or forearms.

### B.     The Eyewitness Identification Testimony

At trial, a number of eyewitnesses who were guests at the party testified about their observations of the fight that led to the fatal stabbing of Ramos and the extent of appellants' involvement in that fight.

#### 1.     Stephanie Chagolla

Chagolla testified that all of the men from the uninvited group of people participated in the fight, but she did not know about Calleros. One of the men involved in the fight was Sanchez, who had a visible "PN" tattoo on his neck. Another man who participated in the fight had an outline of a "PN" tattoo on the back of his head. Chagolla saw Sanchez and one other person fighting with Ramos at the same time, and Sanchez was holding a knife during the fight. Chagolla then saw Ramos suddenly fall forward onto the ground.

4

During an initial interview with the police shortly after the stabbing, Chagolla was hysterical and crying. She said that Ramos had been shot, but she could not describe any suspects. Later that day, Chagolla told the police that she had seen a Hispanic man with a knife and gave a physical description, but did not mention any tattoos. A week after the stabbing, Chagolla was shown a photographic lineup that included Sanchez, but did not make an identification. In May 2011, Chagolla attended a live lineup that again included Sanchez. At that time, she indicated that Sanchez and one other individual looked like people who were involved in the fight. She wrote on the admonition form, "It's between two and three. I'm confused. There's something about them that seems familiar."

### 2. Jesus Munoz

Munoz testified that all four appellants were among the group that forced its way into the party, and that Sanchez was one of the men who fought with Ramos. The fight started when an unidentified man punched Ramos as he was standing by the gate. That man made a "jabbing" motion toward Ramos's stomach, and punched him twice before Ramos punched back. Sanchez then began hitting Ramos and making a thrusting motion toward his chest. Munoz did not see Sanchez with a weapon, but Ramos's shirt appeared to be sticking to Sanchez's hand as they fought. Munoz testified that most of the people in the uninvited group participated in the fight. When asked if anyone in the group did not participate, Munoz stated that he saw Gonzalez standing there but not fighting.

The morning after the stabbing, Munoz provided the police with a description of the person who had stabbed Ramos, but did not indicate that he had any tattoos. Munoz also told the police that he knew one of the men who was present at the gate but did not come into the party as "Chino Man" from the Pico Nuevo gang.[2] In February 2011, Munoz was shown several photographic lineups and identified each appellant, except Sanchez, as being present at the scene. In May 2011, Munoz attended a live lineup and identified Sanchez at that time. He wrote on the admonition form that Sanchez "was

---

[2]     One of Gonzalez's former gang monikers was "Chino Man."

there for sure. Tattoos and face [are] what I remember clearly." At a preliminary hearing held in January 2012, Munoz could not recall anyone at the party fighting with Gonzalez or Resendez.

### 3.    Josue Salazar

Josue Salazar testified that he saw Calleros and two unidentified men force their way into the party and rush toward Ramos. Ramos stood in place and tried to block the group like an offensive lineman. One of the men then pushed Ramos, who responded by punching the man and knocking him down. Salazar did not see Calleros push or punch anyone during the fight. In October 2011, Salazar was shown several photographic lineups that included appellants, but was unable to identify anyone.

### 4.    Jade Carrasco

Jade Carrasco testified that she saw Calleros rush through the gate with a group of people. Men in hoodies then began fighting with Ramos and other guests, but Carrasco could not tell who threw the first punch. She did not see Calleros hit anyone. In February 2011, Carrazco was shown a series of photographic lineups, and identified Calleros and Gonzalez as two of the people who had rushed into the backyard. She selected Gonzalez because his face was familiar to her from the party. At the preliminary hearing in January 2012, Carrazco indicated that Gonzalez was one of the men that she had seen fighting, but she could not recall the extent of his involvement or with whom he had fought.

### 5.    Brittany Bernal

Brittany Bernal testified that she saw a group of people fighting near the gate, but she did not recognize anyone in the group. She then saw Ramos lying on the ground. After the fight in the backyard ended, Bernal went to the front yard and got into a fight with Calleros, whom she knew from high school. Bernal and Calleros punched each other with their fists, and Calleros pulled out a large clump of Bernal's hair. Bernal then

6

left the scene with her cousin, Janine Hernandez, and her cousin's boyfriend, Raymond Sanchez, in a dark-colored Cadillac Escalade.[3]

The morning after the stabbing, Bernal was interviewed by the police at her mother's home. She was uncooperative with the officers and initially refused to speak to them. In a tape-recorded interview, Bernal eventually stated that she saw Sanchez standing at the gate with a group of people. He was wearing a black hoodie. Bernal later saw Sanchez and "maybe two others" fighting with Ramos, but did not see when Ramos was stabbed. Bernal also admitted that she fought with Calleros in the front yard of the house after Calleros punched her in the face.

### 6. Christian Cedano

Christian Cedano testified that he heard an argument by the gate and then saw a group of people fighting. In an interview with the police the following day, Cedano provided a description of three Hispanic men who he had observed fighting with Ramos, but did not mention that any of them had tattoos. In September 2011, Cedano was shown a series of photographic lineups, and identified Gonzalez as "being in the fight when [Ramos] was stabbed."

### 7. Odilon Valadez

Odilon Valadez testified that he heard a commotion near the gate and then saw a group of about four men and two women trying to gain entry into the backyard. Ramos told the group to stay outside because they were not invited. Ramos also tried to hold the gate closed, but the group was able to force it open and a fight broke out in the backyard. Valadez saw Ramos exchange punches with at least one other man, but he did not see who threw the first punch or how Ramos ended up on the ground. Valadez believed that

---

**3** Bernal testified that, earlier that evening, Hernandez and Raymond Sanchez picked her up from the party so that she could get some marijuana. They then drove Bernal back to the party, but did not join Bernal and the other guests in the backyard. The fight started sometime after Bernal returned to the party while Hernandez and Raymond Sanchez were still parked outside.

Ramos was trying to avoid throwing punches, but had no choice.  In September 2011, Valadez was shown a series of photographic lineups and identified Sanchez, Gonzalez, and Resendez as being in the group of people that had tried to force their way into the party.  At the time, Valadez was under the impression that he had to select a photograph from each lineup.  However, he was never told that the target suspects were included in the lineups or that he should select certain individuals in making his identifications.

### C.    The Gang Expert Testimony

Officer Hang Ortega testified as an expert on criminal street gangs.  There are five primary gangs in the Pico Rivera area, including Pico Nuevo, Pico Viejo, and Rivera.  Pico Nuevo has at least 300 members and is a rival of the Pico Viejo and Rivera gangs.  The primary activities of the gang include assault and battery, homicides, drug sales, possession of firearms, witness intimidation, gang graffiti, and robberies.  Chagolla's house was located in the territory claimed by Pico Nuevo.

Sanchez, Gonzalez, and Resendez were Pico Nuevo gang members.  Sanchez and Gonzalez were "well respected active gang members" who held "clout within the gang at the street level."  Resendez did not hold the same status as Sanchez and Gonzalez, but was an active member of the gang.  Calleros's boyfriend, Mark Luna, was a lower-ranking Pico Nuevo gang member.  Calleros herself had not been jumped into the gang, did not have any gang tattoos or monikers, and had not admitted to being a gang member.  She also had no prior arrests for gang-related or violent crimes.  However, based on the facts of this case, the Los Angeles County Sheriff's Department now considered Calleros to be a member of the Pico Nuevo gang.

Sanchez, Gonzalez, and Resendez all had tattoos signifying their membership in the gang.  Sanchez, known as "Little Joker," had a tattoo of "Pico Nuevo" that ran around his head, and other prominent Pico Nuevo tattoos on his neck, arm, and upper torso.  One tattoo showed a cartoon character pointing a gun and another indicated violence toward a rival gang.  Gonzalez, known as "Gunner" or "Little G," had large Pico Nuevo tattoos on his back and chest and a tattoo of the words "Vieja Killer" on his arm.  Resendez, known

8

as "Chucky," had a "GND" tattoo on the top of his head, signifying his membership in the Grande clique of Pico Nuevo, and a tattoo of a rat with an "X" through the eye, symbolizing death to a rival gang. In addition, Resendez had a large outline of the letters "PN" tattooed on the back of his head.

According to Ortega, gang members often commit crimes in a group because there is "safety in numbers." They also tend to carry weapons, such as knives or guns. There was "a lot of value" to a gang in attacking a person who was not a gang member because "the word gets out there that this gang is violent," which generates fear in the community. Citizens then stop giving information to the police and testifying in court. Ortega opined that if a gang killed a young man who was not a gang member, it "would probably be more celebrated" than frowned upon by the gang. Ortega further explained that if a non-gang member hit a gang member, the gang could not "back down" because "violence is who they are" and "how they identify themselves." The gang would expect that a "back-up would render aid" to the gang member who was hit. Ortega was aware of at least one other incident where a Pico Nuevo gang member was assaulted and the gang responded to the assault by committing a murder. Ortega also was aware of instances where a fist fight involving gang members escalated to a violent assault or homicide with guns, knives, or other weapons being used.

When presented with a hypothetical based on the facts of this case, Ortega opined that the crimes would have been committed for the benefit of, at the direction of, or in association with a criminal street gang. He based his opinion on the fact that uninvited gang members had tried to enter a party and a fight ensued that resulted in a killing. The gang would take credit for the crime, which "would make big news in the Pico Rivera community." The crime would generate fear and have a psychological effect on the community, which would prevent residents from cooperating with the police. It also would enhance and elevate the fearful reputation of the gang. Ortega's opinion would not change even if the gang members were told that they could come into the party or the crime occurred outside of the gang's claimed territory.

9

Ortega further testified that if the gang members in the hypothetical had demanded entry into the party and exclaimed that "this is our hood," it would strengthen his opinion that the crimes were committed for the benefit of the gang. Such a statement would be a proclamation of the gang's violent nature. Moreover, because a lot of people in the Pico Rivera area grew up with gang members and were familiar with gang terminology, the announcement that "this is our hood" would create an "intimidation factor," which played a large part in gang-related crimes.

### III.    The Defense Evidence

The defense called Jesus Barraza, a guest at the party, to testify at trial. Barraza was friends with both Chagolla and Ramos. At some point during the party, Ramos approached a large group of people standing near the gate. A fight broke out, and Barraza saw a Hispanic man jab Ramos three times in his chest. The man was 20 to 25 years old, approximately five feet four inches in height and 190 pounds in weight, with a tattoo of red lips on the side of his neck.[4] Barraza could not tell if the man was holding a weapon in his hand. After the man jabbed Ramos in his chest, Ramos responded by punching the man. Three other men then rushed toward Ramos and attacked him. In September 2011, Barraza was shown a photographic lineup that included Raymond Sanchez, the Pico Nuevo member with the red lips tattoo, but did not identify anyone.

The defense also called two of the officers who first responded to the scene of the crime and took initial statements from the witnesses. The officer who interviewed Munoz confirmed that Munoz never mentioned Calleros. The officer who interviewed Chagolla testified that Chagolla initially reported that Ramos had been shot and that she

---

[4]    At the time of the stabbing, Colt Sanchez was 24 years old, weighed 150 pounds, and had a tattoo of a large "P" on his throat. Raymond Sanchez, the person who drove Bernal away from the party after the fight, was 23 years old, heavy-set, and had tattoos of red lips on his neck and the words "Pico Nuevo" on his upper lip. Raymond Sanchez also was a member of the Pico Nuevo gang.

10

had seen the suspects run away, but she was unable to identify or describe any of them. Chagolla also did not mention Calleros in her initial statement.

Finally, Dr. Robert Shomer testified for the defense as an eyewitness identification expert.

## IV.     Verdict and Sentencing

The jury found each appellant not guilty of first degree murder, but guilty of second degree murder with a true finding on the gang enhancement allegation.  The jury also found true the allegation that Sanchez personally used a deadly or dangerous weapon during the commission of the crime.  In a bifurcated proceeding, the trial court made true findings on the prior serious or violent felony conviction allegations for Sanchez and Gonzalez.  The trial court sentenced Sanchez to state prison for 36 years to life, Gonzalez to state prison for 30 years to life, and Resendez and Calleros to state prison for 15 years to life.  Each appellant filed a timely notice of appeal.

## DISCUSSION

## I.     Sufficiency of the Evidence on the Second Degree Murder Convictions

Appellants first challenge the sufficiency of the evidence supporting their convictions for second degree murder.  Sanchez contends there was insufficient evidence to support a finding that he was the direct perpetrator in the stabbing death of Ramos. Gonzalez, Resendez, and Calleros each claim the evidence was insufficient to support their convictions under an aiding and abetting theory of liability.  We conclude each appellant's conviction in this case was supported by substantial evidence.

### A.     Applicable Law

To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.  [Citation.] The record must disclose substantial evidence to support the verdict - i.e., evidence that is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the

11

defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Murder is the unlawful killing of a human being or a fetus "with malice aforethought." (§ 187, subd. (a).) "Malice may be either express or implied. [Citation.] Express malice is an intent to kill. . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses. [Citation.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) "A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder. [Citation.] 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)

"[A]n aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be

12

guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault. [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

To convict a defendant under the natural and probable consequences doctrine, the jury "must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime[;] . . . (4) the defendant's confederate committed an offense other than the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*People v. Prettyman* (1996) 14 Cal.4th 248, 262, fn. omitted.) "Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonable foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).) "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. [Citations.]" (*Ibid*.)

### B.      Sanchez as the Direct Perpetrator of the Murder

Sanchez argues that his conviction for second degree murder must be reversed because the evidence that he was the person who stabbed Ramos was based on inconsistent and unreliable eyewitness identifications. It is well-established, however, that "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585; see also *People v. Boyer* (2006) 38 Cal.4th 412, 480 ["[i]dentification of the defendant by a single

13

eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime"].) Therefore, "'[e]xcept in … rare instances of demonstrable falsity, doubts about the credibility of [an] in-court witness should be left for the jury's resolution… .' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 996.)

In this case, there was substantial evidence to support a finding that Sanchez killed Ramos by stabbing him in the chest. Chagolla testified that she saw Sanchez holding a knife and fighting with Ramos. Munoz testified that he saw Sanchez thrusting his hand at Ramos's chest as they fought. Although Munoz did not see Sanchez with a weapon, he noticed that Ramos's shirt appeared to be sticking to Sanchez's hand. There was also evidence that Bernal told the police in an interview the morning after the stabbing that she saw Sanchez fighting with Ramos. The autopsy showed that Ramos sustained three stab wounds from a sharp object such as a knife, including a fatal wound to the chest that pierced his heart. From this evidence, the jury reasonably could have found that Sanchez was the person who fatally stabbed Ramos during the fight.

Sanchez asserts that the witnesses' identifications of him as the perpetrator were inconsistent and inherently unreliable. He points out that neither Chagolla nor Munoz identified him in the photographic lineups that were shown to them a week after the stabbing. At the live lineups held several months later, Chagolla merely stated that Sanchez and one other person seemed familiar, and Munoz identified Sanchez as being present at the party, but did not indicate that Sanchez had fought with Ramos. Sanchez also notes that Bernal testified that she was "wasted" when the fight occurred, and that she felt the officers who interviewed her were "putting words in [her] mouth." However, the witnesses' identifications of Sanchez were neither physically impossible nor inherently improbable, and any weaknesses in those identifications went to the weight of the evidence, not the admissibility. Moreover, evidence casting doubt on the credibility of the eyewitness identification evidence was presented to the jury and argued at length by counsel. Sanchez's counsel had a full opportunity to cross-examine the witnesses about their recollection of events surrounding the stabbing and the pretrial identification procedures used by the police, and to expose any inconsistencies in the witnesses'

14

identifications and testimony.[5] The jury accordingly was able to judge the credibility of the eyewitness identification evidence, and reasonably could have concluded from such evidence that Sanchez was the direct perpetrator in the stabbing death of Ramos. Sanchez's conviction for second degree murder was supported by substantial evidence.

## C.     Gonzalez, Resendez, and Calleros as Aiders and Abettors

Gonzalez, Resendez, and Calleros argue that their convictions must be reversed because the evidence was insufficient to support a finding of guilt under an aiding and abetting theory of liability. They assert that the prosecution failed to prove that they directly aided and abetted the murder committed by Sanchez, or that murder was a natural and probable consequence of any target crime that they were alleged to have aided and abetted. We conclude there was substantial evidence to support a finding that Gonzalez, Resendez, and Calleros each aided and abetted an assault and that murder was a natural and probable consequence of the assault under the circumstances of this case.[6]

The California Supreme Court has held that murder can be a natural and probable consequence of a simple assault in certain circumstances such as a gang attack. (*Medina*, *supra*, 46 Cal.4th at p. 916.) In *Medina*, the defendants and the victim were members of rival gangs. A verbal challenge by the defendants led to a fistfight. After the fight, one defendant shot and killed the victim as he was driving away. The Court concluded that

---

[5]     To the extent Sanchez is claiming that unduly suggestive pretrial identification procedures tainted the eyewitness identifications made in court, he has forfeited that claim by failing to make a timely objection in the trial court. (*People v. Elliott*, *supra*, 53 Cal.4th at pp. 585-586.)

[6]     The trial court instructed the jury that the target crime for purposes of the natural and probable consequences doctrine was disturbing the peace in violation of section 415, subdivision (1), trespass in violation of section 602, subdivision (m), or simple assault or battery in violation of sections 240 and 242. Because we conclude that the evidence was sufficient to support a finding that Gonzalez, Resendez, and Calleros aided and abetted an assault that foreseeably resulted in murder, we need not consider whether there was substantial evidence supporting the prosecution's alternative theories of aiding and abetting liability.

the evidence was sufficient to support the murder convictions of the non-shooting defendants because "a rational trier of fact could have concluded that the shooting death of the victim was a reasonably foreseeable consequence of the assault." (*Ibid.*) The Court reasoned that "the ultimate factual question is one of reasonable foreseeability, to be evaluated under *all* the factual circumstances of the case." (*Id.* at p. 927.) Under the facts of the case, "the jury could reasonably have found that a person in defendants' position (i.e., a gang member) would have or should have known that retaliation was likely to occur and that escalation of the confrontation to a deadly level was reasonably foreseeable as [the victim] was retreating from the scene." (*Id.* at pp. 922-923.)

The Supreme Court in *Medina* also concluded that "in the gang context, it was not necessary for there to have been a prior discussion of or agreement to a shooting, or for a gang member to have known a fellow gang member was in fact armed." (*Medina*, *supra*, 46 Cal.4th at p. 924.) Instead, "[t]he issue is 'whether, under all of the circumstances presented, a reasonable person in the defendant's position would have *or should have known* that the [shooting] was a reasonably foreseeable consequence of the act aided and abetted by the defendant.'" (*Id.* at p. 927; see also *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10 [fatal shooting during fistfight between rival gangs was natural and probable consequence of fight]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1055-1056 [shooting of rival gang member during retreat from fight was natural and probable consequence of assault despite lack of knowledge that associate was armed]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1375-1376 [defendant's punching of victim during gang fight foreseeably resulted in fatal shooting of victim by fellow gang member].)

When viewed in the light most favorable to the verdict, the evidence was sufficient to support the second degree murder convictions of Gonzalez, Resendez, and Calleros under the natural and probable consequences doctrine. The prosecution presented evidence that Calleros, along with a group of seven to nine people that included Sanchez, Gonzalez, and Resendez, demanded entry into Chagolla's party. At the time, Sanchez, Gonzalez, and Resendez were active members of the Pico Nuevo gang and Calleros was the girlfriend of a Pico Nuevo gang member. Calleros argued with Ramos after

16

appellants repeatedly were told that they could not enter the party because it was by invitation only for Chagolla's family and friends. Calleros continued to demand entry, and at one point, exclaimed "this is my hood." Appellants and other members of their group then forced their way into the party by pushing or rushing into the backyard.

There was also evidence that, after entering the backyard, appellants' group almost immediately began fighting with the guests. Sanchez and one to four other men directly fought with Ramos who, according to one witness, was punched twice before he punched back. Sanchez then stabbed Ramos with a knife. Another man from appellants' group waved a semi-automatic gun at the guests and fired several shots into the air. It is true, as appellants assert, that only Sanchez was identified at trial as one of the individuals who had fought with Ramos. It is also true that there was conflicting testimony at trial about the extent of each appellant's involvement in the fighting that took place with the other guests. However, considering the totality of the evidence, the jury reasonably could have found that Gonzalez, Resendez, and Calleros each aided and abetted a gang-related fight that foreseeably resulted in the murder of Ramos.

Specifically, the jury reasonably could have inferred from the evidence presented that both Gonzalez and Resendez were participants in the fight and not mere bystanders. Carrasco identified Gonzalez in a photographic lineup as one of the people who rushed into the party, and testified at the preliminary hearing that the person she had identified was among those who were fighting in the backyard. Cedano likewise identified Gonzalez in a photographic lineup as "being in the fight when [Ramos] was stabbed." Although none of the witnesses testified that they saw Resendez fighting with any guests, both Munoz and Valadez identified Resendez as being with the group that forced its way into the party. Munoz also explained that he saw everyone in that group taking part in the fight except Gonzalez. In addition, Chagolla testified that one of men that she saw fighting had an outline of the letters "PN" tattooed on the back of his head, and the evidence showed that Resendez had such a tattoo.

Multiple witnesses also identified Calleros as being with a group of gang members while demanding entry into the party, and their testimony supported an inference that

17

Calleros played a significant role in instigating the fight that ensued in the backyard. Munoz testified that Calleros stopped him from closing the gate after he allowed in two of his friends and repeatedly told him to "let us in" as she stood by with several Pico Nuevo gang members. Chagolla testified that, after Ramos approached the group at the gate, Calleros argued with him and insisted that she and her companions be allowed into the party. Calleros also announced "this is my hood" when Ramos refused to grant her entry. Salazar confirmed that Calleros argued with Ramos at the gate, and that Calleros and two others then forced their way into the party by rushing into the backyard toward Ramos. While Calleros did not engage in any fighting in the backyard, Bernal testified that she got into a fight with Calleros in the front yard of the residence after the fight in the backyard ended. Bernal also told the police that she was "trying to throw everybody out," and that her fight with Calleros began when Calleros "socked [her] in the face."

In addition to the evidence showing each appellant's involvement in the fight, the prosecution's gang expert, Officer Hank Ortega, testified that it was common for gang members to carry weapons and to commit crimes in groups. He also stated that it was fairly common for a fistfight involving gang members to escalate to a deadly assault with guns, knives, or other weapons being used. While there was no evidence showing that Gonzalez, Resendez, or Calleros knew Sanchez was armed with a weapon, such knowledge is not required under the natural and probable consequences doctrine. As the Supreme Court observed in *Medina*, "escalating violence is a foreseeable consequence to be expected in gang confrontations," and "prior knowledge that a fellow gang member is armed is not necessary to support a defendant's murder conviction as an aider and abettor." (*Medina*, *supra*, 46 Cal.4th at pp. 926, 921; see also *People v. Montes*, *supra*, 74 Cal.App.4th at p. 1056 ["[g]iven the great potential for escalating violence during gang confrontations, it is immaterial whether [defendant] specifically knew [a fellow gang member] had a gun"].)

Calleros also contends the evidence was insufficient to support her conviction because the jury appeared to be confused in its application of the natural and probable consequences doctrine to this case. The record reflects that, during deliberations, the jury

18

asked for clarification on the following statement in CALCRIM No. 401 on direct aiding and abetting liability: "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that . . . [t]he defendant knew that the perpetrator intended to commit the crime." In response, the trial court instructed the jury to review the instructions on general principles of aiding and abetting liability and the natural and probable consequences doctrine. Calleros claims the jury's question shows that it could not agree which act constituted the target crime, and that it likely "threw in the towel" and decided appellants "must all be guilty of something." However, the jury's question regarding an aider and abettor's knowledge of a perpetrator's intent was not directly related to the identity of the target crime under the natural and probable consequences doctrine, and in any event, the jury "need not unanimously agree on the specific target crime that the defendant aided and abetted." (*People v. Prettyman*, *supra*, 14 Cal.4th at pp. 267-268.) The record does not support Calleros's suggestion that the jury "simply threw in the towel" in returning its verdicts.

Based on the totality of the record, there was substantial evidence that a reasonable person in appellants' position either would have or should have known that the fatal stabbing of Ramos was a natural and probable consequence of the fight that erupted when their group forced its way into the party and caused a confrontation with Ramos and the other guests. The evidence was therefore sufficient to support the second degree murder convictions of Gonzalez, Resendez, and Calleros.[7]

_____

[7] In addition to challenging the sufficiency of evidence supporting her conviction, Calleros asserts that the trial court erred in denying her pretrial section 995 motion to set aside the information for lack of probable cause. She argues that there was an inadequate evidentiary showing at the preliminary hearing to support the murder charge and the gang enhancement allegation filed against her. However, "[w]here the evidence produced at trial amply supports the jury's finding, any question whether the evidence produced at the preliminary hearing supported the finding of probable cause is rendered moot. Even ""[i]f there is insufficient evidence to support the commitment, the defendant cannot be said to be prejudiced where sufficient evidence has been introduced at … trial"" to support the jury's finding as to the charge or as to the truth of the allegation. [Citations.]"

## II. Sufficiency of the Evidence on the Gang Enhancements

Appellants also challenge the sufficiency of the evidence supporting the jury's true findings on the gang enhancement allegations. They specifically contend the evidence was insufficient to support the jury's findings that they committed the charged crime for the benefit of, at the direction of, or in association with a gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members. We conclude the gang enhancement findings were supported by substantial evidence.

### A. Relevant Law

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

To obtain a true finding on a gang enhancement allegation, the prosecution must prove that the crime at issue was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) "It is well settled that expert testimony about gang culture and habits is the type of evidence a

---

(*People v. Crittenden* (1994) 9 Cal.4th 83, 137.) Because the evidence presented at trial was sufficient to support Calleros's second degree murder conviction, and as discussed below, the gang enhancement finding, Calleros cannot show that she was prejudiced by the trial court's pretrial ruling on her section 995 motion.

jury may rely on to reach . . . a finding on a gang allegation.  [Citation.]"  (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.)  "'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth."  [Citation.]  Such a hypothetical question must be rooted in facts shown by the evidence, however.  [Citations.]'"  (*People v. Ward* (2005) 36 Cal.4th 186, 209.)  While a gang expert may not ordinarily testify whether the defendant committed a particular crime for the benefit of a gang, the expert "properly could . . . express an opinion, based on hypothetical questions that tracked the evidence, whether the [crime], if the jury found it in fact occurred, would have been for a gang purpose."  (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)  Indeed, "'[e]xpert opinion that particular criminal conduct benefited a gang" is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement.  [Citation.]"  (*Ibid*.)

### B.  The Gang Enhancements Were Supported by Substantial Evidence

In this case, there was substantial evidence connecting the fatal stabbing of Ramos to the Pico Nuevo gang.  The jury heard evidence that Sanchez, Gonzalez, and Resendez were active members of the Pico Nuevo gang, and that each of them had prominent gang tattoos signifying their membership.  Sanchez and Gonzalez, in particular, were "well respected active gang members" who held "clout within the gang at the street level."  Although Calleros was not a known gang member at the time of the stabbing, she was affiliated with the gang as the girlfriend of a known Pico Nuevo member.  On the night of the stabbing, Calleros was accompanied by a group of Pico Nuevo gang members when she tried to gain entry into the party with her group.  The party was held in a territory claimed by the gang, and Calleros exclaimed "this is my hood" when Ramos refused to allow Calleros and her group to enter.  Although there was no evidence that members of the group called out gang names or threw gang signs during the ensuing fight, both Sanchez and Resendez were later identified as participants in the fight based, in part, on their visible Pico Nuevo tattoos.  Given that the fight which led to the stabbing of Ramos involved multiple known gang members in gang territory, the jury reasonably could have

found that the motive for the crime was gang-related. (*People v. Albillar*, *supra*, 51 Cal.4th at p. 68 ["if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members"]; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 ["[c]ommission of a crime in concert with known gang members . . . supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime"].)

The jury also heard expert opinion testimony that, based on a hypothetical drawn from the evidence in this case, the murder would have been committed for the benefit of the Pico Nuevo gang and with the specific intent to promote criminal conduct by gang members. Ortega, the prosecution's gang expert, explained that gang members often committed crimes in groups because there was "safety in numbers," and that if a gang member was hit during a fight, fellow gang members would be expected to "render aid" and could not "back down." Ortega further opined that a gang's murder of a non-gang member would generate fear in the community, which would prevent citizens from reporting crimes and cooperating with the police. The murder also "would make big news in the Pico Rivera community," which would elevate and enhance the reputation of the gang. (See *People v. Albillar*, *supra*, 51 Cal.4th at p. 63 ["[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang'"]; *People v. Gardeley* (1996) 14 Cal.4th 605, 619 [based on expert testimony that a gang relied on violent assaults to frighten residents, "the jury could reasonably conclude that the attack on [the victim] . . . was committed 'for the benefit of, at the direction of, or in association with' that gang"].)

From this evidence, the jury reasonably could have found that the murder of Ramos was committed for the benefit of, at the direction of, or in association with the Pico Nuevo gang, and with the specific intent to promote, further, or assist in criminal

22

conduct by gang members. The jury's true findings on the gang enhancements as to each appellant were supported by substantial evidence.

## III.    Admission of Photographic Evidence

Sanchez contends that the trial court erred in admitting into evidence a photograph of him lying next to a grave while holding a gun. He claims that the photograph was irrelevant and unduly prejudicial under the Evidence Code, and its admission deprived him of the constitutional right to due process. We conclude the trial court did not abuse its discretion or violate due process in admitting the photograph.

### A.    Relevant Background

Prior to trial, Sanchez objected to the admission of the photograph. The front of the photograph showed Sanchez with a gun lying next to a grave. There was writing on the back of the photograph which stated, "My baby brother Colt lying down on our two homies grave site, Victor and Anthony." According to the prosecutor, Victor and Anthony Del Ariva were Pico Nuevo gang members and one of them was a murder victim. The prosecutor argued the photograph was relevant to the natural and probable consequences theory of liability, reasoning that "[w]hat we have is Mr. Sanchez laying on the grave, displaying his tattoos prominently, holding a firearm, and he's on his dead comrade's grave. If that doesn't show that he's aware the natural and probable consequences of a fight could be a death or murder could occur, at least violence is an adjunct to violence, I don't know what would be probative." The trial court admitted the front of the photograph, but excluded the writing on the back.

During trial, Ortega, the prosecution's gang expert, testified that the photograph depicted Sanchez lying next to a grave with a pistol in his hand and a beer can set on top of the grave. Ortega noted that Anthony Del Ariva, the name on the grave, was a Pico Nuevo gang member who was murdered in 2008. Ortega explained that it was common for gang members to visit the grave site of a deceased member and either drink a beer or place it on the grave in honor of the deceased. During closing argument, the prosecutor referred to the photograph and stated, "You can all see he is holding a gun in his right

23

hand and he's pointing it down at the grave. Why is this important? How could you say that this man does not know that his gang entails violence, that the gang life he has chosen is a violent life and he embraces it and accepts it."

## B. The Trial Court Properly Admitted the Photograph

Sanchez claims the trial court erred in admitting the photograph because it was not relevant to the natural and probable consequences doctrine and was unduly prejudicial. A trial court generally has broad discretion concerning the admission of evidence. (*People v. Carter* (2005) 36 Cal.4th 1114, 1167; *People v. Cole* (2004) 33 Cal.4th 1158, 1197.) "'"The rules pertaining to the admissibility of photographic evidence are well-settled. Only relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. [Citations.] Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends "'logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]" (*People v. Carter*, *supra*, at p. 1167.) Under Evidence Code section 352, evidence is unduly prejudicial if it "'"uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues."'" (*Id*. at p. 1168.)

"'[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question. . . .' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) "'Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]"' [Citation.]" (*People v. Williams* (2013) 58 Cal.4th 197, 270-271.) "'The admission of relevant evidence will not offend due process unless the evidence is so

24

prejudicial as to render the defendant's trial fundamentally unfair.' [Citation.]" (*People v. Jablonski*, *supra*, at p. 805.)

In this case, the trial court did not abuse its discretion or deny Sanchez due process in admitting the photograph. The prosecution's theory of the case against Sanchez was that he was guilty of murder either as the direct perpetrator in the fatal stabbing of Ramos, or as an aider and abettor under the natural and probable consequences doctrine. Evidence that Sanchez had first-hand knowledge of the deadly consequences of gang violence because a fellow gang member had been murdered was relevant to showing that Sanchez would have or should have known that murder was a reasonably foreseeable consequence of a fight by gang members. Moreover, the photograph was a small portion of the evidence presented at trial and was not uniquely likely to evoke an emotional bias. The jury heard other evidence tending to establish that Sanchez was immersed in gang culture, including gang expert testimony about his gang moniker, prominent gang tattoos, and reputation as a well-respected active member of the Pico Nuevo gang. The jury also heard evidence of other prior incidents of gang violence involving Pico Nuevo gang members, including a murder committed by the gang in response to an assault on one of its members. Given the probative value of the evidence as weighed against the risk of undue prejudice, the photograph was properly admitted at trial.

## IV.  Exclusion of Evidence on the Defense of Duress

Resendez argues that the trial court prejudicially erred in precluding him from eliciting gang expert testimony related to duress. He reasons that duress can be a defense to murder when liability is based on the natural and probable consequences doctrine, and that he should have been able to present evidence showing that he was under duress when he allegedly aided and abetted the fight. We conclude the trial court did not err in limiting Resendez's cross-examination of the gang expert on the issue of duress.

### A.  Relevant Background

During the cross-examination of Ortega, Resendez's counsel elicited testimony that the Pico Nuevo gang heavily recruits young people to join its ranks, and that some of

those young people are recruited through threats of violence or coercion. Counsel also elicited testimony that Resendez was younger than Sanchez and Gonzalez, and did not hold the same level of status as either of them within the gang. When asked if Resendez was close in status to Sanchez and Gonzalez, Ortega responded, "It's hard to quantify a measurement. There's some gap there I would say." Resendez's counsel then read from Ortega's preliminary hearing testimony in which he stated that Resendez was "not too close" to Sanchez and Gonzalez in terms of his level of respect within the gang. Ortega explained that Resendez was "part of a younger . . . GND clique" and had "not put in the same amount of work" as Sanchez or Gonzalez.

At a sidebar, the trial court advised Resendez's counsel that "[t]his whole line of questioning is irrelevant and is not going to help the jury decide anything in this case because you cannot use coercion and duress as a defense in a murder trial." Resendez's counsel explained that he was trying to show that his client was "not a violent street criminal" because he "hasn't put in work." Counsel added that his next question to Ortega was going to be whether "you have to put in work." The trial court noted that this question had been asked and answered. The court also reiterated, "If you think you are going to argue at the time of closing argument that Mr. Resendez was just a little ping pong ball among the hard ball, that's not going to work" because California law "does not allow coercion or duress in a murder trial." Resendez's counsel stated that the question was relevant to the natural and probable consequence doctrine because it would show that his client was "a small fry compared to the other guys who have put in work" and he had "never done anything." The trial court replied, "You've done it so you can move on."

### B. The Trial Court Properly Ruled on the Evidence Related to Duress

Resendez asserts that the trial court erroneously precluded him from presenting evidence relevant to the defense of duress. "[S]ection 26 declares duress to be a perfect defense against criminal charges when the person charged 'committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused.'" (*People v.*

26

*Vieira* (2005) 35 Cal.4th 264, 289-290.) Duress does not constitute a defense to murder, and does not reduce murder to manslaughter. (*People v. Anderson* (2002) 28 Cal.4th 767, 781-783.) However, it may provide a defense to murder on a felony-murder theory by negating the underlying felony. (*Id.* at p. 784.) "'The common characteristic of all the decisions upholding [a duress defense] lies in the immediacy and imminency of the threatened action: each represents the situation of a present and active aggressor threatening immediate danger.' [Citations.]" (*People v. Vieira*, *supra*, at p. 290; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 100 ["defense of duress requires a reasonable belief that threats to the defendant's life . . . are both imminent and immediate at the time the crime is committed" and "threats of future danger are inadequate" for the defense].)

Although Resendez argues that duress can provide a defense to murder under the natural and probable consequences theory of aiding and abetting liability, he does not cite any published California case (and we are aware of none) which holds that the defense may be asserted in such circumstances. Even assuming the defense of duress can apply to a natural and probable consequences theory of murder, we conclude that the trial court properly limited Resendez's cross-examination of Ortega because both the evidence that was admitted and the evidence that was excluded were insufficient as a matter of law to support the defense in this case. Resendez sought to elicit testimony showing that a gang member was expected to "put in work" for the gang. However, Ortega already had testified that gang members gain respect by "putting in work, [which] means they commit . . . gang crimes." Eliciting testimony that Resendez would have been expected to "put in work" as a younger, lower-level gang member would not tend to prove that he was acting under a threat of imminent death from his gang when he aided and abetted the assault on Ramos. Evidence that gangs used coercive tactics to recruit new members likewise would not support an inference that there was an immediate threat to Resendez's life at the time he participated in the assault with other active Pico Nuevo gang members. Because the proffered evidence was not relevant to the defense of duress, Resendez has failed to show any prejudicial error in the trial court's ruling.

27

**V.     Failure to Include Voluntary Manslaughter in the Natural and Probable Consequences Instruction**

Gonzalez, Resendez, and Calleros contend that the trial court erred in instructing the jury on the natural and probable consequences theory of liability. They specifically claim that the instruction erroneously failed to include voluntary manslaughter based on a heat of passion theory as one of the non-target offenses that the jury could find was a natural and probable consequence of the target crime originally contemplated. We conclude the trial court did not err in instructing the jury on the natural and probable consequences doctrine because a heat-of-passion killing was not a reasonably foreseeable consequence of the crime that appellants aided and abetted in this case.

**A.     Relevant Background**

The trial court instructed the jury on the elements of the crimes of first degree murder (CALCRIM Nos. 520, 521), second degree murder (CALJIC No. 8.30), and voluntary manslaughter based on a heat of passion theory (CALCRIM No. 570). The trial court also instructed the jury on the general principles of aiding and abetting liability with CALCRIM Nos. 400 and 401, and on the natural and probable consequences theory of liability with CALCRIM No. 403.

The version of CALCRIM No. 403 given to the jury provided as follows: "Before you may decide whether a defendant is guilty of murder, you must decide whether he or she is guilty of disturbing the peace, or trespass, or assault, or battery. [¶] To prove that a defendant is guilty of murder, the People must prove that: [¶] 1. The defendant is guilty of disturbing the peace, or trespass, or assault, or battery; [¶] 2. During the commission of disturbing the peace, or trespass, or assault, or battery, a coparticipant in that offense committed the crime of murder; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the disturbing the peace, or trespass, or assault, or battery. [¶] A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim

28

or innocent bystander. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the murder was committed for a reason independent of the common plan to commit the disturbing the peace, or trespass, or assault, or battery, then the commission of murder was not a natural and probable consequence of disturbing the peace, or trespass, or assault, or battery. [¶] To decide whether the crime of disturbing the peace, or trespass, or assault, or battery was committed, please refer to the separate instructions that I will give you on those crimes. [¶] The People are alleging that the defendant originally intended to aid and abet disturbing the peace, or trespass, or assault, or battery. [¶] If you decide that the defendant aided and abetted one of these crimes and that murder was a natural and probable consequence of that crime, the defendant is guilty of murder. You do not need to agree about which of these crimes the defendant aided and abetted." The instruction did not include voluntary manslaughter as a potential non-target offense of which appellants could be found guilty under the natural and probable consequences doctrine.

## B. Relevant Law

In a criminal case, the trial court must instruct the jury on the general principles of law that are relevant to the issues raised by the evidence and are necessary for the jury's understanding of the case. (*People v. Burney* (2009) 47 Cal.4th 203, 246.) In addition, "it is the 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed.' [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.) "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction' [Citation.]" (*People v. Cole*, *supra*, 33 Cal.4th at p. 1215.) Substantial evidence "is not merely '*any* evidence … no matter how weak' [citation], but rather '"evidence from which a jury composed of reasonable [persons] could … conclude[]"'

29

that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664; see *People v. Burney*, *supra*, at p. 250 ["'[t]o justify a lesser included offense instruction, the evidence supporting the instruction must be substantial – that is, it must be evidence from which a jury . . . could conclude that the facts underlying the particular instruction exist'"].) "On appeal, we review independently whether the trial court erred in failing to instruct on a lesser included offense. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

As discussed, under the natural and probable consequences doctrine, "a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime (the target crime), but also for any other offense (nontarget crime) committed by the confederate as a 'natural and probable consequence' of the crime originally aided and abetted." (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 254.) Accordingly, to convict a defendant of a nontarget crime as an aider and abettor, the jury must find that the defendant assisted or encouraged the commission of a target crime, a confederate committed an offense other than the target crime, and the nontarget offense committed by the confederate was a natural and probable consequence of the target crime that the defendant assisted or encouraged. (*Ibid.*) "[T]he jury need not unanimously agree on the specific target crime that the defendant aided and abetted. . . . Nevertheless, at trial each juror must be convinced, beyond a reasonable doubt, that the defendant aided and abetted the commission of a *criminal act*, and that the offense actually committed was a natural and probable consequence of that act." (*Id.* at pp. 267-268.)

In cases involving the natural and probable consequences doctrine, "an aider and abettor may be found guilty of a lesser crime than that ultimately committed by the perpetrator where the evidence suggests the ultimate crime was not a reasonably foreseeable consequence of the criminal act originally aided and abetted, but a lesser crime committed by the perpetrator during the accomplishment of the ultimate crime was such a consequence." (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1577.) Therefore, "if the evidence raises a question whether the greater offense is a reasonably foreseeable consequence of the criminal act originally contemplated and abetted, but would support

30

a finding that a lesser included offense committed by the perpetrator was such a consequence," the trial court has a duty to instruct the jury on the lesser included offense for the aider and abettor. (*Ibid*.) However, "the trial court need not instruct on a particular necessarily included offense if the evidence is such that the aider and abettor, if guilty at all, is guilty of something beyond that lesser offense, i.e., if the evidence establishes that a greater offense was a reasonably foreseeable consequence of the criminal act originally contemplated, and no evidence suggests otherwise." (*Ibid*.)

Manslaughter is a lesser included offense of murder. (§ 192; *People v. Thomas* (2012) 53 Cal.4th 771, 813.) Voluntary manslaughter is "the unlawful killing of a human being without malice . . . upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) "Heat of passion arises if, "'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."' [Citation.]" (*People v. Beltran*, *supra*, 56 Cal.4th at p. 942.) "'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion,'" and the "'heat of passion must be due to "sufficient provocation."'" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143-1144.) "[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59.) "Adequate provocation and heat of passion must be affirmatively demonstrated. [Citations.]" (*Id*. at p. 60.)

31

## C. The Trial Court Did Not Err in Instructing the Jury on the Natural and Probable Consequences Doctrine

Gonzalez, Resendez, and Calleros argue that the trial court erred in failing to include voluntary manslaughter as a non-target offense in the natural and probable consequences instruction because the jury was entitled to consider whether murder or voluntary manslaughter was a natural and probable consequence of the target crime they allegedly aided and abetted. They reason that, even if the evidence could not support a finding that the direct perpetrator killed Ramos in a sudden quarrel or heat of passion, a properly instructed jury nevertheless could have found that only a heat-of-passion killing would have been reasonably foreseeable to a person in the aider and abettor's position. While appellants are correct that an aider and abettor may be convicted of a lesser offense than the direct perpetrator, a trial court is not required to instruct the jury on the lesser offense if the evidence establishes that a greater offense was a reasonably foreseeable consequence of the crime originally contemplated and no evidence suggests that the lesser offense was such a consequence. We reach that conclusion in this case.

Even when viewed in the light most favorable to appellants, the evidence showed that they were with a group of people who intentionally forced their way into a party to which they were not invited and caused a confrontation with Ramos, who told the group that he did not want any trouble but they could not stay. The physical fight began when a person from appellants' group pushed, punched, or jabbed at Ramos, who responded by punching the person back. There was no evidence from which a jury reasonably could find that Ramos or any other guest initiated the fight, acted as the aggressor, or engaged in any legally adequate provocation that would make a heat-of-passion killing reasonably foreseeable. None of the witnesses testified that Ramos ever used or threatened to use physical force prior to being assaulted by one or more members of appellants' group. Nor did any of the witnesses testify that Ramos or any other guest ever engaged in deadly force during the fight. Instead, the evidence established that members of appellants' group provoked the fight by rushing or pushing their way into the backyard and then physically assaulting Ramos, who solely responded to the attack with non-deadly force.

32

It is settled law that "[a] defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion. The claim of provocation cannot be based on events for which the defendant is culpably responsible." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 83; see also *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1303 ["a defendant who provokes a physical encounter by rude challenges to another person to fight . . . is not entitled to claim that he was provoked into using deadly force when the challenged person responds without apparent (or actual) use of such force"].) It is also well-established that ""'[a] provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter.""" (*People v. Najera* (2006) 138 Cal.App.4th 212, 226; see also *People v. Gutierrez*, *supra*, 45 Cal.4th at pp. 826 "[a] voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words, a technical battery, or slight touching"].)

Appellants do not cite to any evidence presented at trial which could support a finding that Ramos engaged in any legally sufficient provocation which could have led Sanchez to kill him in sudden quarrel or heat of passion. Rather, Gonzalez and Resendez contend that, in evaluating their culpability under the natural and probable consequences doctrine, the relevant question is not whether Sanchez actually acted under a heat of passion when he fatally stabbed Ramos, but whether it would have been reasonably foreseeable to a person in their position that a heat-of-passion killing would occur. There was, however, no evidence to support a finding in this case that voluntary manslaughter was a reasonably foreseeable consequence of the target crime that appellants aided and abetted. Instead, the evidence established that if Gonzalez, Resendez, or Calleros were guilty at all, a heat-of-passion killing was not a reasonably foreseeable consequence of their physical confrontation of an unarmed victim who neither provoked the confrontation nor engaged in any deadly force during the ensuing fight. Because there

33

was no substantial evidence to support a finding that voluntary manslaughter based on a heat of passion theory was a reasonably foreseeable consequence of the crime aided and abetted, the court did not err in failing to include this lesser offense in the natural and probable consequences instruction.[8]

## VI.    Failure to Instruct on Imperfect Self-Defense or Defense of Another

Appellants assert that the trial court also erred in refusing to instruct the jury on voluntary manslaughter based on imperfect self-defense or imperfect defense of another. They reason that, because the trial court instructed the jury on justifiable homicide based on perfect self-defense or defense of another, an instruction on imperfect self-defense also was warranted under the circumstances of the case. We conclude the trial court did not err in refusing to give the requested instruction because the evidence was insufficient to support a lesser included offense instruction under this theory.

### A.    Relevant Law

Voluntary manslaughter, based on imperfect self-defense, is committed when the defendant kills in "'[a]n honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury.'" (*People v. Rogers* (2006) 39 Cal.4th 826, 883.) The doctrine of imperfect self-defense "is 'narrow' and will apply

---

**8**     Gonzalez also argues that the jury was not properly instructed on the natural and probable consequences doctrine because the standard of objective reasonableness should not apply to aiding and abetting liability when the non-target offense is second degree murder. However, as Gonzalez acknowledges, the California Supreme Court has held that, in determining liability under the natural and probable consequences doctrine, the "'question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable.'" (*Medina*, *supra*, 46 Cal.4th at p. 920; see also *People v. Chiu* (2014) 59 Cal.4th 155, 162 [liability under the natural and probable consequences doctrine "'"'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted"'"'].) We thus conclude the jury was properly instructed on the standard of objective reasonableness in the natural and probable consequences instruction. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that "'""*must be instantly dealt with.*"'" [Citation.]" (*Ibid*.) "'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.'" (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) Moreover, "[t]he doctrine of imperfect self-defense cannot be invoked . . . by a defendant whose own wrongful conduct (for example, a physical assault or commission of a felony) created the circumstances in which the adversary's attack is legally justified. [Citations.]" (*People v. Booker*, *supra*, 51 Cal.4th at p. 182, fn. omitted; see also *People v. Frandsen* (2011) 196 Cal.App.4th 266, 274 ["[i]mperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is *legally* justified in resorting to self-defense against the defendant"].) "'[A]s with perfect self-defense or any defense, "[a] trial court need give a requested instruction . . . *only if there is substantial evidence to support the defense*.' [Citations.]'" (*People v. Manriquez*, *supra*, at p. 581.)

### B.     The Evidence Did Not Support an Imperfect Self-Defense Instruction

Appellants contend that the trial court was required to instruct the jury on the theories of imperfect self-defense and imperfect defense of another because there was evidence that Ramos was a large man at six feet two inches and 275 pounds, and that during the fight, Munoz saw some Pico Nuevo gang members being stomped on while they were on the ground. Appellants claim that the jury reasonably could have concluded from such evidence that imperfect self-defense or imperfect defense of another was a foreseeable consequence of the assault on Ramos, but that murder was not. We conclude, however, that the imperfect self-defense doctrine did not apply in this case.

As discussed, there was no evidence that Ramos was the initial aggressor in the fight or ever responded with deadly force in defending himself against the physical attack by appellants' group. Although there was conflicting testimony about the extent of each appellant's involvement in the attack, none of the eyewitnesses testified that Ramos (or any other guest at the party) initiated the fight or was armed with a weapon during the fight. Rather, the witnesses who saw how the fight began testified that Ramos did not use

35

any physical force against anyone until the group rushed into the backyard and one or more men in the group assaulted Ramos by pushing, punching, or jabbing him. The witnesses further testified that, once the fight started, they saw multiple men assaulting Ramos, who threw punches at those men, but did not use any other force. While Munoz testified that, at one point, he saw someone kicking or stomping on a Pico Nuevo gang member who was on the ground, he did not identify Ramos as that person. Munoz also testified that members of both groups were on the ground at various times, and agreed that it was "just sort of a big fight." In addition, the witnesses who saw Ramos being stabbed testified that both Ramos and the person who stabbed him were standing upright at the time. None of the witnesses saw Ramos with a weapon, nor did they see Ramos assault Sanchez or any of his companions while they were on the ground.

Accordingly, there was no evidence that Ramos used deadly force during the assault or acted in a way that was not legally justified. (*People v. Booker*, *supra*, 51 Cal.4th at p. 182 [where "defendant initiated the attack . . . and there was no evidence that [victims'] subsequent actions were not legally justified, he may not claim imperfect self-defense"]; *People v. Seaton* (2001) 26 Cal.4th 598, 664 ["[b]ecause defendant's testimony showed him to be the initial aggressor and the victim's response legally justified, [he] could not rely on unreasonable self-defense"].) There also was no evidence that Sanchez stabbed Ramos because he actually feared he was in danger of imminent death or great bodily injury, or honestly believed that any of his companions were in danger of such harm. Nor was there any evidence that Gonzalez, Resendez, or Calleros acted under an actual belief of imminent danger when they aided and abetted the assault. Instead, appellants assert that there must have been sufficient evidence of their honest belief in the need to defend because the trial court instructed the jury on perfect self-defense and perfect defense of others. However, "just because a trial court instructs a jury on perfect self-defense, this does not necessarily mean it has a sua sponte duty to also instruct on *imperfect* self-defense." (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1231; see also *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 834 ["an imperfect self-defense instruction is not required just because the court is instructing on

36

actual self-defense"].)  Where, as here, there is no substantial evidence of an honest belief in the need to defend oneself or others from an imminent danger of death or great bodily injury, an instruction on imperfect self-defense or defense of another is not required. (*People v. De Leon* (1992) 10 Cal.App.4th 815, 825 [even though trial court gave a perfect self-defense instruction, it properly omitted instruction on imperfect self-defense where "there was no substantial evidence [defendant] honestly believed he was in imminent peril").]  The trial court therefore did not err in refusing to instruct the jury on this theory.

## VII.    Failure to Instruct on Involuntary Manslaughter

Appellants argue that the trial court further erred in failing to instruct the jury on the lesser included offense of involuntary manslaughter.  They assert that an involuntary manslaughter instruction was required in this case because the jury reasonably could have found that the fatal stabbing of Ramos was an unintentional killing that occurred during the commission of a misdemeanor crime.  We conclude the trial court did not err in failing to give an involuntary manslaughter instruction.

### A.    Applicable Law

Involuntary manslaughter is a lesser included offense of murder.  (*People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1145.)  Involuntary manslaughter is statutorily defined as the killing of a human being without malice, "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, [accomplished] in an unlawful manner, or without due caution and circumspection." (§ 192; subd. (b).)  In addition to these statutory forms of involuntary manslaughter, "an unintentional homicide committed in the course of a noninherently dangerous felony may properly support a conviction of involuntary manslaughter, if that felony is committed without due caution and circumspection." (*People v. Burroughs* (1984) 35 Cal.3d 824, 835, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89.)

In *People v. Bryant* (2013) 56 Cal.4th 959 (*Bryant*), the California Supreme Court considered whether a homicide committed without malice in the course of an inherently

dangerous assaultive felony could be voluntary, rather than involuntary, manslaughter. The *Bryant* court held "[a] defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life. Such a killing cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life." (*Id*. at p. 970.) The *Bryant* court declined, however, to reach the corollary question of whether such a killing could be involuntary manslaughter. (*Id*. at p. 971.)

This court recently addressed that question in *People v. Brothers* (Apr. 21, 2015, B255043 ___ Cal.App.4th ___ [2015 Cal.App.LEXIS 332] (*Brothers*). After reviewing the relevant case authority on voluntary and involuntary manslaughter, we concluded that "if an unlawful killing in the course of an inherently dangerous assaultive felony without malice must be manslaughter [citation] and the offense is not voluntary manslaughter [citation], the necessary implication of the majority's decision in *Bryant* is that the offense is involuntary manslaughter." (*Id*. at [p. 10].) Therefore, "when the evidence presents a material issue as to whether a killing was committed with malice, the court has a sua sponte duty to instruct on involuntary manslaughter as a lesser included offense, even when the killing occurs during the commission of an aggravated assault. [Citations.] However, when . . . the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter. [Citation.]" (*Id*. at [p. 12].)

### B. The Evidence Did Not Support an Involuntary Manslaughter Instruction

Appellants contend that the trial court had a sua sponte duty to instruct the jury on involuntary manslaughter because there was evidence that Ramos's death was the result of an unintentional killing that occurred during the commission of a misdemeanor offense such as disturbing the peace, trespass, simple assault, or brandishing a knife. They reason

that that a properly instructed jury could have found that Sanchez merely "poked" Ramos with a knife in a criminally negligent manner, but did not intend to kill him. This claim fails because the evidence did not support an involuntary manslaughter instruction.

The evidence at trial showed that, after being denied entry into the party, a group of seven to nine people that included appellants and several other Pico Nuevo gang members rushed or pushed their way into the backyard, and then almost immediately began fighting with the guests. At least one member of appellants' group was armed with a knife and another member had a semi-automatic gun. Sanchez and one to four other men fought with Ramos, and during the fight, Ramos was stabbed three times. One of the stab wounds went four inches into Ramos's shoulder, and the fatal stab wound went four and three-quarter inches into his chest, piercing his heart. Based on this evidence, no reasonable jury have found that Sanchez merely "poked" Ramos with a knife in a criminally negligent manner. Given the violent nature of the assault, the number of assailants involved, and the extent of Ramos's injuries, the jury also could not have reasonably found that Ramos was killed unintentionally during the commission of a misdemeanor or otherwise lawful act done without due caution and circumspection. Nor was there any evidence from which a reasonable jury could have found that appellants lacked a subjective understanding of the risk their conduct posed to human life.

Instead, the only reasonable inference that could have been drawn from the evidence was that Ramos was fatally stabbed in a deliberate use of violent force the natural consequences of which were dangerous to human life, and that Gonzalez, Resendez, and Calleros each acted with a conscious disregard for life when they aided and abetted the criminal act committed by Sanchez. (See *People v. Huynh* (2002) 99 Cal.App.4th 662, 679 [defendant's deliberate acts with knowledge that his confederate's acts could result in death precluded a finding of criminal negligence and involuntary manslaughter instruction]; *People v. Evers* (1992) 10 Cal.App.4th 588, 598 [intentional use of violent force against the victim, knowing the probable consequences of one's actions, precludes an instruction on involuntary manslaughter].) Because there was no substantial evidence to support a finding that the stabbing death of Ramos was

39

involuntary manslaughter, the trial court did not err in failing to instruct the jury on this lesser included offense.

## VIII. Cumulative Error

Appellants contend that the cumulative effect of the claimed errors deprived them of due process of law and a fair trial. We disagree. Whether considered individually or for their cumulative effect, none of the errors alleged by appellants affected the process or accrued to their detriment. (*People v. Sanders* (1995) 11 Cal.4th 475, 565.) As our Supreme Court has observed, a defendant is "entitled to a fair trial but not a perfect one. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) In this case, each appellant received a fair trial. There was no cumulative error requiring reversal.

### DISPOSITION

The judgments are affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

FEUER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.